MAQBCONA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CINDY CONAHAN,

            Plaintiff,

        v.                      20 Civ. 1325 (LJL)

MEDQUEST LTD, *et al*,

            Defendants.
                               Oral Argument
------------------------------x
                               New York, N.Y.
                               October 26, 2022
                               12:00 p.m.

Before:

                HON. LEWIS J. LIMAN,

                             District Judge

                    APPEARANCES

KRAKOWER DiCHIARA LLC
     Attorneys for Plaintiff
BY:  MICHAEL R. DiCHIARA

BOND, SCHOENECK & KING, PLLC
     Attorneys for Defendants
BY:  LOUIS P. DiLORENZO

MAQBCONA

1            (Case called; appearances noted)

2            THE COURT:  So we're here today on the motion of the

3    defendants for summary judgment and cross-motion of the

4    plaintiff for summary judgment.  I'm prepared to hear first

5    from counsel for defendants on their motion, as well as on the

6    plaintiff's motion.  You can address both, and then I'll hear

7    from plaintiff then I'll hear from defendants again.  At the

8    conclusion of the argument today, I'd like you both to stay

9    around to order a copy of the transcript on an expedited basis

10   so I've got it available to me.  Go ahead.

11           MR. DiLORENZO:  Your Honor, our motion for summary

12   judgment, the case involves age, sex and retaliation on the

13   claims that were brought.  We don't believe, as our papers

14   indicate, that even a prima facie case has been established in

15   any of them.  And if there was a prima facie case established,

16   we think we've articulated legitimate non-discriminatory

17   reasons for the two discrimination cases.  I'll talk about the

18   retaliation case separately.

19           On the age case, the plaintiff worked for this

20   company, small company, six employees for about 28 years.  She

21   was hired by the owner who was two years older than her.  He

22   hired her at the time.  She worked for him, closely with him,

23   handling all the money, running the office.  He is the owner,

24   very actively involved in the business.  He was two years older

25   than her.  He's the decision maker.  Under no circumstances is

MAQBCONA

there any evidence to support an age claim.  The entire age

claim hinges on a remark that was made to her -- she alleges

was made to her in a meeting shortly before she left work on

her own.  She decided to leave.  What happened was, there was a

meeting.  The owner's wife, the other individual defendant,

Leslie Inzunza.  Leslie had come into the operation about a

year earlier as an independent contractor with a design of

modernizing the office, creating computer systems, enhancing

the technology and so on, also hiring a forensic accounting

firm to look into all the systems that were being used in the

office.  Which greatly upset the plaintiff actually and caused

one of the confrontation with the defendant and her earlier.

        The day before this alleged remark was made, there was

a meeting with the accountants that had issued a report with

recommendations as to how the office should change.  The

plaintiff was very upset during that meeting, grimaced, made a

number of faces, got angry.  And by her own admission, she shut

down in that meeting, refused to cooperate any further.  The

next day Leslie sent a text message to their accountant saying

she was going to go in and talk to her because they needed her

help to implement these systems, and she was going to try to

reengage her.  She went into her office for that purpose, had a

discussion with her.

        One of the things she tried to explain was that if the

technology was better, everybody in the office would be able to

MAQBCONA

work more easily remotely, which they were doing from time to
time but problems with the systems.  This was before the
pandemic.  The plaintiff got upset.  She then launched into a
tyrant about things that were wrong with Leslie's husband, how
he didn't know what he was doing in the business.  How
everything that had been done was owed to her.

At that point, Leslie indicated to her she should lay
off the Xanax.  She took Xanax.  The plaintiff took Xanax.  In
fact, she admits she had given Xanax to Leslie in the past when
she asked for it.  She then -- our version is she chased Leslie
out of the office.  She ran into her husband's office, closed
the door.  Plaintiff admits that she barged into that office
without knocking.  She shook her bottle of pills.  Said I'm
taking pills, I'm not a drug addict.  Your wife's accused me of
being a drug addict.  She claims she said something about she's
accused me of being too old to commute.  Although in her
deposition the only time she said that was when her deposition
was finished, and plaintiff's counsel asked her a leading
question at the end of that deposition --

THE COURT:  It may have been in response to
plaintiff's counsel's question, and it may have been a leading
question.  In fact, it was a leading question, but she still
answered yes to the question.  Did you tell Elliot -- referring
to the individual defendant -- that Leslie had said you were
too old to commute to the city.  So isn't that enough to create

MAQBCONA

1   a triable issue that when she was fired by Leslie's husband a

2   week later after they had been on vacation together that the

3   termination was based upon age.

4            MR. DiLORENZO:  I don't believe, with all due respect,

5   your Honor, I don't believe so.  There's no testimony

6   whatsoever -- there's no proof or evidence of any kind that

7   Leslie influence his decision to terminate her.  In fact, she

8   called -- when he talked to her the next day, she left on her

9   own.  She said, I'm leaving, and she left the office because

10  she was so upset.  The next day when they spoke on the phone,

11  the first thing she said to him was, Do I still have a job.

12           And when I asked her at her deposition why would you

13  ask that question the next day.  She said because I had just

14  thrown -- then she caught herself.  And said, Asked his wife to

15  leave.  Because I threw -- stopped, I asked his wife to leave.

16  Why would she ask the next day do I still have a next job if

17  all she did was ask his wife to leave her office, please leave

18  my office.

19           THE COURT:  And Mr. Stone's answer was, We have to

20  talk about it when I get back from vacation.

21           MR. DiLORENZO:  That's correct.  And he refused to

22  accept -- he told her, I don't know if you have a job.  I'm

23  going to have to think about.  This is bad.

24           THE COURT:  So can't a jury infer that during the week

25  that he was thinking about it, or maybe it's not even a full

MAQBCONA

week when he was with Leslie and then he comes back and says, I

need to terminate you, part because of this thing with Leslie

that he was terminating her because of her comment that she's

too old to commute.

MR. DiLORENZO:  I don't believe so.

THE COURT:  In other words, it's not really a stray

remark because it's made by somebody who is present in

presumably the most intimate way one can be under the law with

a decision maker for an extended period of time immediately

preceding the time when the decision is made.

MR. DiLORENZO:  Well, your Honor, that would be pure

speculation.  I don't know what the jury could rely on to make

that allegation.  She admitted to us in her deposition she has

no evidence that Leslie influenced that decision.  There's no

evidence other than speculation.  The other thing is, your

Honor, it still has to be a discriminatory remark.  All she's

saying is -- she's claiming is, You're too old to commute.

It wasn't said in the context.  There's no

relationship between that stereotypical remark, a stereotypical

remark based on age with the adverse employment action that

they're claiming was taken.  It was made in the context of,

including the text message sent to the accountant before the

meeting, I need to engage her.  Yesterday's meeting was a

disaster.  She's not helping us with the new technology.  The

appeal made was, it will make it easier for people to work

MAQBCONA

1   remote including yourself.  And so the context is not -- the

2   context of the remark was you can continuing to work for us.

3   It would make it easier for you to work for us.  Not that, you

4   know what, You're too old to work.  You're too old to commute

5   to New York so you need to leave employment.  Nobody says that

6   was the subject of the conversation.  So the context is not

7   even discriminatory.  It still has to be discriminatory

8   comment.

9           THE COURT:  That's a very powerful argument.  And if I

10  were a fact finder, maybe I would agree with you, but isn't

11  there enough that a reasonable jury could disagree and I should

12  leave it to the jury to make that determination or at least at

13  this stage I need to leave it to the jury to make that

14  determination and we'll see how it plays out at a trial?

15          MR. DiLORENZO:  Your Honor, I don't believe so because

16  I think when you look at the stray remark cases this doesn't

17  fit any of that.  It's 28 years, no remark.  The comment was

18  not made in the context of opposing age discrimination or age

19  discrimination by Leslie or Elliot.  In 28 years of working

20  together, she's never heard an age or sex discriminatory remark

21  made by anybody in that office.

22          THE COURT:  Can you refresh me as to what the summary

23  judgment record looks like as to the latest date that Mr. Stone

24  said to the plaintiff, You've got a job.  I want you to stay

25  around.

MAQBCONA

1          MR. DiLORENZO:  I'm sorry.

2          THE COURT:  I know that there is testimony to the

3     effect that Mr. Stone told the plaintiff that her job was not

4     at risk, that he would want her to stay around.  What is the

5     latest date on which such a statement was made to the

6     plaintiff.

7          MR. DiLORENZO:  I think it was made during the period

8     that -- I'm not sure the exact date, but I think it was made

9     during the period of approximately within a year of the

10    termination while because of -- and she admitted in her

11    testimony -- that she didn't enjoy Leslie coming to the office

12    and engaging in this modernization and she was upset about

13    those things and the threat to her position and all the control

14    and autonomy she had had running the office.  So he tried to

15    put her at ease.

16          And in fact during that period there was a potential

17    sale of the business to another company, and he indicated to

18    her he wanted her to stay.  He wanted her to stay through that

19    sale if it happened.  She had a job and tried to reassure her

20    on that basis that she had employment.  But it was all out of

21    her insecurity and concern about this modernization approach,

22    that we're not going have to handmade records anymore.  We're

23    actually going to be modernizing the business.  Leslie is

24    coming in to help do that.  We're going to have new technology,

25    and she admitted in her deposition that upset her.

MAQBCONA

1          THE COURT:  It very well may be that the truth, in

2     quotation marks, is that plaintiff was terminated because she

3     had an angry -- she was not cooperative with the accountants

4     and she had an angry conversation with Leslie after which she

5     ran screaming into Mr. Stone's office and Leslie had to hide

6     behind a chair that seems like it's quite a powerful argument.

7     But isn't it at least plausible that what changed between when

8     Mr. Stone was giving the comforting words to the plaintiff and

9     the decision to terminate was the comment about you're way too

10    old?

11         MR. DiLORENZO:  I don't know how your Honor because,

12    assuming -- the record doesn't contain it, but assuming there

13    was vacation talk between husband and wife about what happened,

14    the context of the conversation was, It will make it easier for

15    you to do your job.  If age has something to do with how easier

16    it is to commute in and out of New York City, that stereotype,

17    that alleged stereotype remark in this context, even in the

18    context she's alleging, doesn't indicate any adverse action is

19    going to be taken.  The opposite.  We're trying to make it

20    easier for her to do her job.  She should embrace the

21    technology because at the end of the day, it's only going to be

22    good for her and everybody else and the business.

23         That's clear from the meeting the day before.  The

24    purpose of the going into her office to try to calm her down

25    and reengage her because they needed her help because she

MAQBCONA

1   controlled all the systems at the time.  And the comment was,

2   it will be better for you too. It will enable you to do your

3   job and work as long as you want.

4          THE COURT:  I understand that point.

5          MR. DiLORENZO:  That's the age one.  Your Honor, I

6   don't see anything on the sex one.  Her replacement, they

7   offered the job to a woman.  Leslie is a woman.  There's no sex

8   remarks.

9          On the retaliation, your Honor, everything turns in my

10   mind on the statement we've been talking about which is alleged

11   to be opposition to discriminatory activity of the employer,

12   that she complained about the remark.  And if you look at their

13   complaint, they made it very clear that she reported the

14   discrimination to Elliot.  I think it's paragraphs 34 and 35 of

15   their complaint paragraph 56.  She complained about

16   discrimination to Elliot, and as a result she got fired.  As I

17   said before, Leslie was an independent contractor.  The

18   complaint was not about any employer policy.

19          THE COURT:  Couldn't a jury conclude that she was at

20   least an employee and a pretty senior employee from her various

21   statements that she makes in terms of -- she makes a number of

22   statements in terms of what she needs the plaintiff to do where

23   it looks like she's actually exercising some control and

24   authority on the part of the company.

25          MR. DiLORENZO:  Well, your Honor consultants can have

MAQBCONA

1    authority, and she was given authority to work on the

2    modernization of the equipment, make some changes in how things

3    were being done.  But regardless of whether --

4              THE COURT:  Surely it's not the fact that she's being

5    paid pursuant to a 1099 that categorically as a matter of law

6    disqualifies her from being an employee.

7              MR. DiLORENZO:  Well, it's true, your Honor.  Just the

8    fact that she's a 1099 employee or a 1099 person doesn't make

9    her an independent contractor or an employee, the facts do.

10   But as you can see by the way things were happening, she said

11   in the meeting and tried to facilitate between -- as was her

12   responsibility, facilitate between the accountants and their

13   report and the employee of medQuest that was in charge of the

14   office, the plaintiff.  She tried to facilitate that.  Then she

15   worked with the accountants, said I'm going to go talk to her,

16   try to reengage here.

17              If she was a high level employee, she could have fired

18   her at the meeting where she shut down and refused to

19   cooperate.  Instead she was working, which the responsibility

20   she was given as a consultant to try to modernize the office,

21   engage the office in becoming better with technology and so on.

22   Whether she's an employee or an independent contractor -- I'm

23   sorry.  I forgot what I was going to say.

24              THE COURT:  You were going to -- whether there was

25   protected activity.

MAQBCONA

1          MR. DiLORENZO:  Yes. She still has to be complaining

2      about discrimination at the hands of the employer.  And whether

3      she's an independent contractor employee, she has to be some

4      kind of decision maker.  She has to have made the decision.

5      There's no evidence in this record at all that she made the

6      decision to terminate the plaintiff that was made by Mr. Stone.

7          THE COURT:  I mean, that goes back to the discussion

8      we had earlier.  Assuming that I disagree with you on that and

9      conclude that a jury could reach the conclusion that Leslie had

10     an influence on the decision, and that Mr. Stone fired the

11     plaintiff because of something that -- either that Leslie said

12     to him or that was reported to him about the plaintiff, about

13     Leslie's discriminatory conduct, wouldn't that be enough to go

14     to a jury?

15         MR. DiLORENZO:  I don't think so, your Honor.  We've

16     put forth legitimate non-discriminatory reason for the

17     termination.  It's the same one the plaintiff went to bed at

18     night thinking about the next morning.  Why did you say, Do I

19     still have a job.  Because I threw -- oh, I asked his wife to

20     leave my office.  So there's the non-intervening

21     non-discriminatory reason.  And I still don't see the complaint

22     about a discriminatory activity.  She admitted in her

23     deposition I never used the word "age." I never used the word

24     "discrimination."  In fact, after those questions --

25         THE COURT:  What if she testified that she went into

MAQBCONA

1    Mr. Stone and said, Leslie said I'm too old to commute to the

2    city.  That's discriminatory and I don't like it.  Would that

3    be protected activity?

4            MR. DiLORENZO:  I believe it would be, your Honor.  If

5    she said -- not that I don't like it.  If she said I'm too old

6    to commute to the city, and I believe that's age discrimination

7    or discriminatory, enough specificity to make it clear she's

8    complaining about discrimination, not a general grievance.  I

9    don't like the way she talk to me.  She accuse me of being a

10   drug addict.  Those things don't qualify.  The cases are pretty

11   clear on that.

12           THE COURT:  You don't need to put a particular label

13   on your claim of discrimination.  Let's put it in a different

14   context.  Let's say that an employee went into a boss and said

15   so and so called me a racially derogatory term.  And then

16   shortly after that the employer fired the person who had --

17   who's the subject of the racially derogatory term, couldn't a

18   jury find that the decision was made -- couldn't a jury find

19   that the complaint that somebody was called a racially

20   derogatory term was protected activity.

21           MR. DiLORENZO:  Yes, I believe.  But I think that's a

22   different case, your Honor.

23           THE COURT:  Because this is way too old to commute --

24           MR. DiLORENZO:  Because of the context of the

25   conversation.  It's not a discriminatory remark.  The race

MAQBCONA

1   comment on its face would be -- would indicate discriminatory

2   animus.  This is the opposite.  This is a meeting, by all and

3   every piece of evidence in the record, a meeting for the

4   purpose of trying to get her on board with the modernization.

5   And the remark, if it was made -- I guess we have to assume for

6   the motion it was made -- the remark was made in the context of

7   convincing her that embracing the technology and being able to

8   work remotely would cut down on how much commuting she would

9   have to do to New York and still do the job and be able to do

10  the job help, her do the job.

11          THE COURT:  I don't know that either of you have

12  looked at or cited to me the Second Circuit's decision in a

13  case called *Milord*.  It's a case in which I granted summary

14  judgment to the defendant and the Circuit reversed me finding

15  that a comment that I had concluded was not particularly

16  race-based could be construed by a jury to be race-based.  And

17  that on the basis of that, a jury could also conclude that the

18  otherwise legitimate non-discriminatory reasons for the

19  employee's non-promotion were protectoral.  It's worth looking

20  at.

21          MR. DiLORENZO:  Thank you, your Honor.  Wish I had.  I

22  did get a bunch of your cases.  I didn't see that one.  In any

23  event, your Honor, I just don't see how that remark could be

24  considered protected activity in the terms of an actual

25  complaint.  I just don't think she was coming in to complain

MAQBCONA

1    about age discrimination.  I think should would have used those

2    words, something like that. As opposed to the emphasis on the

3    Xanax, and she's accused me of being a drug addict, and she

4    told me that you're building a file on me.  You have a file on

5    misconduct that I've engaged in.  This termination didn't come

6    out of the blue, your Honor, that problems had been persisting

7    since 2015. There's a bunch of handwritten notes about the

8    conduct towards other employees.  It's a small business, six

9    employees. She had the HR function.  There was no HR director.

10   Again, I just think that the cases indicates that's a stray

11   remark that really can't support a retaliation claim.  It's

12   just too general, especially the context that it was made in.

13        THE COURT:  Do you want to address the counterclaim?

14        MR. DiLORENZO:  Yes, your Honor.  And, your Honor, I

15   want to apologize for the mix up on the affidavit we submitted.

16   It was terrible.  I apologize.  You have no idea what I went

17   through on those two occasions of amending that.

18        Our counterclaim, your Honor, is pretty simple. Your

19   Honor, before I leave the retaliation.  I just want to say that

20   in these papers for the first time the allegation was made that

21   the counterclaim itself is a form of retaliation.  That's not

22   in the complaint.  And, of course, it couldn't be because the

23   counterclaim -- and we raised this in our papers, your Honor.

24   The counterclaim came obviously after the complaint.  The

25   complaint has never been amended.  The complaint alleges

MAQBCONA

1   retaliation that resulted -- retaliation by the defendant that

2   resulted in her termination.  She was terminated.

3          THE COURT:  There is a paragraph in the complaint.

4   It's paragraph 40, where the plaintiff says, In another act of

5   retaliation, defendants have threatened to sue plaintiff if she

6   pursues her claim.

7          MR. DiLORENZO:  There's nothing in the record that I

8   know of concerning that, your Honor.

9          THE COURT:  I mean, that may very well be right, and

10  it may be the reason why ultimately their claim of -- that the

11  counterclaim is retaliatory will not survive.  But it may not

12  survive because it's not objectively baseless, and not because

13  it's not referred to in the complaint.  I take your point that

14  in order for me to rely upon the allegation in the complaint as

15  raising a triable issue, there has to be some evidence in the

16  record.  It can't just be an allegation in the complaint, but

17  complaints are supposed to put parties on notice.  And this

18  allegation seems to sufficiently put you on notice that I can't

19  get rid of it on that particular basis.

20         MR. DiLORENZO:  Well, your Honor, shortly before the

21  summary judgment motions were filed we produced to the

22  defendants a number of documents we received from credit card

23  companies and other companies.  An objection was made by the

24  plaintiffs indicating they were going to seek sanctions, delay

25  in the proceedings, further depositions and so on.  I wrote a

MAQBCONA

1    letter to the Court saying that we would withdraw them because

2    we weren't relying on them.  You said we could dismiss the

3    objections and get on with it.  If they're allowed to proceed

4    on this retaliation claim of the counterclaim being the

5    retaliation, I would ask for an opportunity -- because that is

6    part of the material they relied on.

7              THE COURT:  We'll talk about that after the plaintiff

8    gets up.  I'm skeptical with respect to the retaliation claim

9    with respect to the counterclaim.  I do have questions about

10   whether the counterclaim should survive as a counterclaim.

11   Leave aside the bit about retaliation, so why don't you focus

12   on that.

13             MR. DiLORENZO:  So, your Honor, the motion for summary

14   judgment on the counterclaim by the plaintiffs was odd in that

15   there was no real support for the motion.  The declaration from

16   the plaintiff came in response to our opposition.  We then

17   got -- which contains a number of things I would like to reply

18   to, but I didn't have an opportunity.

19             THE COURT:  What do you say, construing the evidence

20   favorably to the non-moving party, being you, the evidence in

21   the summary judgment record which show that would support a

22   jury verdict that the plaintiff here breached her fiduciary

23   duties?

24             MR. DiLORENZO:  It would be, your Honor, the testimony

25   of Elliot Stone principally in terms of bank accounts that he

MAQBCONA

1    does not believe he opened in banks, one of the banks is in

2    Tribeca. He never was aware they had an account in Tribeca. He

3    signed things -- his declaration back to the response they had

4    would have been, she put things in front of him and he signed

5    them.  Those checks that she made out to cash for two and

6    $3,000 on that account, he has no knowledge of what that was

7    for.  He doesn't understand why there would be checks made out

8    by her for cash in those amounts. He has no recollection of

9    them whatsoever.

10            THE COURT:  So I take it your point is that those

11   checks for cash are not for company business, and therefore

12   constitute a breach of fiduciary duty?

13            MR. DiLORENZO:  Yes.  In his declaration he indicates

14   that, either him or Leslie, that the business is not a cash

15   business.  They paid their bills by check.  The only cash that

16   he would get would be from -- have her get from the ATM machine

17   for three or $400 a week that he would need for spending money,

18   but not checks made out to cash for $2,000 for these various

19   accounts.

20            THE COURT:  I do have one other question, and then

21   I'll give you a minute or two at the end.  It was not clear to

22   me from your papers in terms of your theory of breach of

23   fiduciary duty, in particular the damages that you're seeking.

24   I could see two alternatives, and maybe you're pursuing both.

25   One of them is the, quote, faithless agent type theory where

MAQBCONA

1   basically you're seeking all of the compensation that the

2   plaintiff was paid.  The New York cases, I'm sure you're aware,

3   make that a difficult claim to pursue.  There also are cases

4   where a person has not totally abandoned their role as a

5   fiduciary, but they breached their duties in particular

6   respects given rise to claims for damages.  Are you pursuing

7   solely a claim that she was a faithless agent who totally

8   abandoned her role and you're entitled to get everything back?

9            MR. DiLORENZO:  Your Honor, the way I read the New

10  York cases, if there's a breach of a fiduciary duty, including

11  embezzlement, that that is a total breach of your obligation.

12  Not that you -- the cases I've been involved in, it didn't

13  matter whether they continued to do their job if they engaged

14  in that breach of a fiduciary duty.  And here, we also have the

15  transit check issues.

16           THE COURT:  And you say under the case law you get

17  everything back?

18           MR. DiLORENZO:  Yes, your Honor.

19           THE COURT:  If I disagree you with you on that, do you

20  lose?

21           MR. DiLORENZO:  I understand, your Honor.  I guess

22  that would be an alternative theory as to whatever the remedy

23  would be appropriate if it was found, if that was the way the

24  cases were read.  Somehow we're entitled to something if

25  embezzlement --

MAQBCONA

1          THE COURT:  I need to look back at the case law, which

2     I will.  The cases that I'm familiar with, there's a New York

3     case some time ago involving *Kozlowski* from Tyco where the

4     claim was that he was taking money from the company.  I think

5     that courts concluded on the allegations there that he had

6     totally abandoned his role as a fiduciary.  But I don't think

7     that the case would have come out the same way if, for example,

8     he just took company money for one particular personal plane

9     ride.

10          Again, I would be surprised if the law supported the

11     notion that a employee who on one occasion misused the company

12     bank account to go to a nice steak dinner or pizza dinner, but

13     by virtue of that alone you could get everything back.  I also

14     would be surprised if you can't get anything back, but I'll

15     hear from the parties.

16          MR. DiLORENZO:  There's more than one incident here,

17     your Honor.  The case I was involved in was a school district

18     in Long Island, and the gentleman was a business manager for a

19     long time.  He was embezzling -- he had an embezzlement scheme.

20     He went on vacation and it was discovered.  He worked hard.  He

21     did a lot of work, but it was discovered that he was stealing

22     money, approximately a million dollars or something like that

23     over 15 years.

24          When we sued under the Faithful Servant Doctrine to

25     get the compensation back, the judge found it to be an

MAQBCONA

1    equitable remedy –– state Supreme Court, equitable remedy, so

2    he gave us about a million dollars back and we also ––

3            THE COURT:  Not the whole thing?

4            MR. DiLORENZO:  A million dollars and his –– he stole

5    about a million dollars, so he gave us a million dollar in

6    compensation back.  But we sued for future retiree benefits,

7    another $2 million of future deferred comp that he was going to

8    get in the future while he was in prison.  And when we appealed

9    it to the Appellate Division, they said it's a total

10   disgorgement involved.  And I can send you that case, your

11   Honor, if you want to see it, but ––

12           THE COURT:  Do you remember the name?

13           MR. DiLORENZO:  It wasn't dollar for dollar.

14           THE COURT:  Do you remember the name?

15           MR. DiLORENZO:  William Floyd school district, your

16   Honor.  I'll can send it to you.

17           THE COURT:  We'll find it. No need for you to send it

18   to me.  I think I would like from both parties a brief maybe by

19   the end of this week just two to three pages maximum whether

20   the Circuit's unpublished decision in *Milord* has an impact on

21   the summary judgment motion.  Let me hear from plaintiff's

22   counsel.

23           MR. DiCHIARA:  Thank you, your Honor.  One thing I do

24   want to add as far as the retaliation component with the

25   counterclaims.  In our answer to the counterclaims, we did

MAQBCONA

1   raise that they were retaliatory as an affirmative defense.  We

2   did have it in our complaint as your Honor noted, and in our

3   answer to the counterclaim, so it's really to be disingenuous

4   to claim that he had no idea that was an allegation at least

5   the claim by plaintiff.

6        THE COURT:  If you lose on summary judgment on the

7   counterclaims, doesn't that really mean that the retaliation

8   claim should go away?

9        MR. DiCHIARA:  At least as it relates to the

10  counterclaim.  I would agree, your Honor, yes.  But I do think

11  there's plenty of evidence to show that the counterclaim is

12  itself retaliatory.  Again, I would just look at --

13       THE COURT:  Why don't you focus -- I mean, when you

14  get to the counterclaim, focus just on your motion for summary

15  judgment and not on whether it's retaliatory, cover whatever

16  you want first.

17       MR. DiCHIARA:  Absolutely, Judge.  I will start with

18  the retaliation aspect of it.  Again, we have her complaining

19  on August 1st, that Leslie Inzunza told her that she was too

20  old to commute to New York, but that's not the only evidence we

21  have of age discrimination.  We do have Leslie Inzunza -- I'm

22  going to refer to her as Leslie because I have difficulty

23  pronouncing the last name if you don't mind.  She wrote notes

24  about the meeting.  And she wrote, I told her if, She's too

25  tired and didn't want to be bothered learning new systems, she

MAQBCONA

1    could move upon and we would wish her well.  Again, it's

2    indicating that she's bringing age into this conversation.

3    Assuming that she's too tired, the commute.  She's too old to

4    work, learning new systems.  Again, she's an old dog, doesn't

5    want to learn new tricks.  This is Leslie's statement.  This is

6    not coming from the plaintiff here.  So there is evidence there

7    that there's an age bias going on.  And Leslie did take over

8    plaintiff's responsibilities, and Leslie is 18 years younger

9    than the plaintiff.

10            THE COURT:  She took over the responsibilities though

11    only after a gentleman was offered the job and ended up turning

12    it down and there was somebody else who turned it down, so it

13    was not immediate.

14            MR. DiCHIARA:  True, I will dear say those people that

15    were offered the job were certainly younger than plaintiff as

16    well.  And again, as far as retaliation goes, we have Stone

17    saying that he expected plaintiff to be there as long as he

18    was, right.

19            THE COURT:  Again the question I asked your adversary,

20    what's the latest date on which Stone makes that comment?

21            MR. DiCHIARA:  I would have to say, in agreement with

22    my adversary, it was probably within the prior six months,

23    because that's when Leslie was going into the office more

24    frequently, having meetings with employees, sort of directing

25    them, making suggestions, so it was probably within that

MAQBCONA

1    timeframe.

2            THE COURT:  Which is the same timeframe of the

3    potential transaction.  That's in someways the context in which

4    the statement is made, the big changes that maybe about to

5    happen with the business.  They're enhancing their technology.

6    They may end up selling it.  She's got a job.

7            MR. DiCHIARA:  Correct.  And as far as evidence of

8    retaliatory animus and whether Leslie was involved or not.

9    Certainly we have statements from Mr. Stone saying -- giving

10   the reasons why he terminated plaintiff.  This thing with my

11   wife, What happened with Leslie.  Those are his statements.

12   He's telling her why she's being fired, and those events

13   occurred one week prior to her termination.

14           Mr. Stone also said, look, plaintiff never complained

15   about the commute being too much.  She never said she didn't

16   want to learn new systems.  This is all coming from Leslie in

17   this meeting that she had with plaintiff.  She raised these

18   issues, and we know it because she wrote it down.  And it's

19   not -- again, we don't know.  We weren't in the room when she

20   went to Stone's office.  But it's not a stretch to say, Leslie

21   told plaintiff she was too old to commute to the city based on

22   what she wrote about what happened during that meeting, Leslie

23   and the plaintiff here.

24           And as far as the -- also those facts also relate to

25   the age claim as well, Judge, the prima facie case, the adverse

MAQBCONA

employment action.  She was terminated again, too old.  And

it's not a stray remark if you look at the totality of the

evidence here.  We have what was written by Leslie after the

meeting, her documentation of the meeting.  Again, if she

didn't want to learn new systems, she was too tired.  And

Leslie even admitted during her deposition, plaintiff didn't

raise those issues.  Plaintiff never said she was too tired.

Plaintiff never said she didn't want to be bothered learning

new systems.  That's Leslie's interpretation.  That's her

injecting her own bias into what occurred between them.

          And I would disagree as far as the gender claim cause

we have two male employees who did actually breach their duty

to the employer here.  We have a Ryan Hilario -- who actually

worked for another company while he was working for medQuest.

Yet, medQuest didn't go after him, didn't sue him, didn't ask

him to return his salary.  And we have another employee

Peter -- and I'm going to butcher his last name.

          THE COURT:  She was not terminated because she worked

for another company, right?

          MR. DiCHIARA:  No.  But again, it's sort of all

conflating to the retaliation and the counterclaim, Judge,

because, again, they're suing her for allegedly breaching her

fiduciary duty, right.  We have two employees who actually did.

We have evidenced.  And Mr. Stone acknowledged that, it's not

like they're speculation as far as what exactly plaintiff did,

MAQBCONA

| 1 | whether she actually took any money, whether those checks

| 2 | written out to cash ended up in her pocket.  There's no

| 3 | evidence that that occurred, but we do have solid evidence that

| 4 | one male employee actually worked for another company.  He

| 5 | wasn't sued.  And another male employee Peter -- again, I'm

| 6 | going to butcher his last name -- Pawelczak.

| 7 |             THE COURT:  You can just say Peter.

| 8 |             MR. DiCHIARA:  Who brought his wife to a business

| 9 | meeting down in Florida, and he expensed everything.  He had

| 10 | the company pay for everything, and he wasn't allowed to.  And

| 11 | he wasn't asked to reimburse the company for the expenses they

| 12 | incurred with his wife.  He wasn't sued for breach of a

| 13 | fiduciary duty.

| 14 |             And also on those lines, this Peter, two other female

| 15 | employees complained about him, that he was a misogynist.  And

| 16 | Mr. Stone did nothing about it.  We also have Peter calling the

| 17 | plaintiff an F'ing bitch while she was at work.  Again, doing

| 18 | nothing about it.  To me this is evidence that she was treated

| 19 | less well than other male employees, and that's the standard

| 20 | under the City Human Rights Law.

| 21 |             And finally, Judge, on the age discrimination.  Two

| 22 | female employees who recently left medQuest were sued by

| 23 | medQuest for breach of some confidentiality.  Again, who is he

| 24 | suing?  He's suing plaintiff who is a female, two other females

| 25 | employees who left, while he has two male employees who we know

MAQBCONA

1    for certain engaged in egregious conduct as far as working for

2    another company and expensing his wife on a business trip when

3    he wasn't allowed to.  There is evidence that that occurred.

4    Yet, nothing happen to them.  He didn't pursue any action

5    against them.  All he's doing is suing the women who use to

6    work for him.

7              THE COURT:  So it is unlawful to file a counterclaim

8    or to -- after somebody has left their job that is my view

9    objectively baseless and done for retaliatory reasons.  But is

10   it unlawful to sue somebody because the person is a woman or

11   some other protected characteristic?  I'm not aware of that.

12   That's not an adverse employment action if the person is no

13   longer an employee.  It's an adverse action that can give rise

14   to a retaliation claim, but not an adverse employment action

15   that could give rise to a discrimination claim, is it?

16             MR. DiCHIARA:  I would agree, Judge.  I do think that

17   it does go to an adverse action to support the retaliation

18   claim as a retaliate agent here, and that's why again we've

19   alleged that the counterclaim is retaliatory for that reason.

20   But again, I think it also does show under the City Human

21   Rights Law, as far as being treated less well, who is he suing,

22   he's only suing the females as oppose to the males.  Again,

23   that demonstrates there is evidence of bias there, your Honor.

24   Unless the judge has any questions?

25             THE COURT:  I do. Why is it on the counterclaims, why

MAQBCONA

 1    hasn't the defendant offered sufficient evidence to go to a

 2    jury from in the form of the declarations from Stone and Leslie

 3    to the effect that, she's the only other signatory on the

 4    account besides Stone.  She made out the checks to cash.  I

 5    didn't authorize her to make out the checks to cash.  The

 6    business doesn't have any need for cash.  You've got a view

 7    from your client that those were all for legitimate reasons,

 8    but you urge me on your claims to view the evidence favorably,

 9    construe every inference in favor of your client.  On the

10    counterclaims, I have to construe the inferences in favor of

11    the defendant.

12         MR. DiCHIARA:  First of all, Judge, there is a

13    three-year statute of limitations on the counterclaim.  A lot

14    of these allegations by the defendants date decades back.  No

15    one has any memory.  No one can say, oh, yeah, this check, this

16    money went into plaintiff's account.  And there's no evidence

17    of that.  But I would point out too, the number of lies that

18    the defendants have documented in this case, and they've

19    submitted to the Court as evidence of retaliation when it comes

20    to the counterclaim.

21         First in the counterclaim itself, right, the

22    defendant's allege that plaintiff was working for another

23    company while she worked for defendants.  And Stone admitted at

24    his deposition that wasn't true, that he misspoke, right.  And

25    this is a document that was filed after consideration

MAQBCONA

1     consulting with an attorney.  There was no pressure to file

2     this or to put that statement in there.

3          THE COURT:  All of this sounds like that that means

4     that there's a great jury question that you've got.  Just as I

5     said to the other guy, you know, listen, you've got terrific

6     jury arguments.  Maybe you've got terrific jury arguments, but

7     doesn't it go to the jury?

8          MR. DiCHIARA:  Well, I think it does go to the jury,

9     but I think it's also evidence of retaliation, going back to

10    the retaliatory aspect of the counterclaim, Judge.  Again --

11    cause I know we're conflating things here.  A lot of the

12    evidence supports multiple claims here that are going on.  But

13    not only did -- Leslie's declaration was clearly false.  Again,

14    that was something that was submitted.  She had time to think

15    about it.  She could have reviewed documents.  She didn't.  She

16    put that in there.  It just shows the desperation for these

17    counterclaims.

18         THE COURT:  I'm looking forward to your

19    cross-examination on Leslie.  You probably are also.

20         MR. DiCHIARA:  Yes, I am.  Because even Stone, when he

21    submitted his declaration said, I didn't know about these bank

22    accounts, right, until after plaintiff was fired.  But he

23    signed these checks from that bank account.  He endorsed -- he

24    made checks out that he wrote to experts.  How could he claim

25    that he didn't have any knowledge of these bank accounts when

MAQBCONA

1    he was writing checks out.  He was endorsing them.  Again, this

2    all goes to retaliatory nature of the counterclaims, but also

3    as the far as the evidence goes, Stone reviewed every single

4    bank statements since 2016.  He didn't notice any

5    improprieties.  Nobody even thought to check if something wrong

6    was going on until after plaintiff sent a letter from her

7    previous attorney saying she was unlawfully terminated based on

8    her age and retaliation.

9            That's when they started to look and dig into

10    documents, oh, yeah, let's –– they were just so angry in

11    response to her dearing to allege that she was subject to

12    discrimination that they filed this counterclaim. They even

13    sent documents to the district attorney.  Again showing how

14    angry and how motivated by retaliation they were.

15            Also in the Leslie's declaration, to the extent the

16    Court wants to credit it given her recantation, the exhibits

17    that she provided show that they received exactly what they

18    paid for in transit checks.  So there is no evidence that

19    plaintiff took somehow these transit checks –– she can only use

20    them for transportation, whether she used them for parking,

21    whether she used them to take trips.

22            THE COURT:  Is that because the transit checks, they

23    were left in the desk when she departed?

24            MR. DiCHIARA:  They were left in the desk when she

25    departed.  They never checked to see how much was actually on

MAQBCONA

those transit checks.  And, in fact -- again, they're just
speculating, that somehow plaintiff profited from using these
extra transit checks when you can only use them for
transportation, right.  And I think that's why Leslie got
caught in the lie because she kept convincing herself and
arguing that these could be used to buy other stuff other than
transportation which is not the case.

        And even with Stone in his deposition testimony he
said that plaintiff wrote checks out to herself, and that's how
he learned that maybe there is something wrong going on.  But
she didn't.  They didn't produce one single check that she
wrote out to herself.  Yes, there were checks made out to cash,
but we have no idea whether those ended up in plaintiff's
pocket or they were used for business reasons for medQuest.
Again, it's just speculation and conjecture.

        And also going back to the exhibits attached to the
Leslie's declaration.  They show there's a discrepancy between
what they ordered in transit checks and what they actually had
from years after plaintiff left.  So it shows they're doing
something wrong, and you'd think that those amounts would
reconcile if plaintiff was actually the one who was engaging in
malfeasance, but they don't.  Their own records show that they
don't have any evidence that plaintiff engaged in any
malfeasance, other than just speculation.  I was going to end
there unless you have anymore other questions.

MAQBCONA

1          THE COURT:  No, very well.  That's very helpful.  I'll

2     give defendant two more minutes just to respond to anything.

3          MR. DiLORENZO:  Just a couple of things, Judge.  The

4     allegation that she was working for another -- so we picked

5     this case up after the first two hours of her deposition.  The

6     pleadings were done, the counterclaim.  We got this case late.

7     But the allegation about working somewhere else came from her

8     picture being on a website.  She convinced Leslie and Elliot to

9     switch 401 carriers, and she showed up on the website of the

10    company they found afterwards, and there's a number of checks

11    involved in that situation.

12         The transit checks from her own records show that

13    there's discrepancies.  The same thing with those cash checks

14    as we said.  These comparators, there's nothing in this record

15    that supports these comparators being similarly situated to

16    what happened here.  One person was given permission to do work

17    for another company at work as long as it didn't interfere with

18    his work, and he worked part-time.  There's no evidence in this

19    record that supports that they were actually comparators

20    treated differently than her because she is a women.

21         The two women they're talking about that got sued

22    started a competing business. It's a restrictive covenant case

23    on a breach of confidentiality, soliciting clients.  That's

24    where those two women that got sued, and that was recently.

25    That was about a year ago I think, and I'll stop there, your

MAQBCONA

1    Honor, unless you have any questions.

2           THE COURT:  The only question I'm got is procedural.

3    Can you refresh me.  Have I set a date yet for on the

4    assumption that I deny the motions for summary judgment, I

5    haven't made a decision but, I have given you a date for a

6    joint pretrial order or for trial.

7           MR. DiLORENZO:  Not that I remember, your Honor.  I

8    think I would have wrote it down.

9           MR. DiCHIARA:  I think we do have a trial date in

10   February.  I don't have my phone.

11          THE COURT:  I'm going to try to get you a decision

12   quickly in any event, but I would appreciate no more than two

13   to three single space pages if that on whether the Circuit's

14   decision in *Milord* has any relevance to the issues in the case.

15   Thank you both.  Very helpful.

16          (Adjourned)

17

18

19

20

21

22

23

24

25